IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| IMCO GENERAL CONSTRUCTION INC., | ) ) ) | No. 77434-4-I |
| | ) | DIVISION ONE |
| Appellant, | ) ) | |
| v. | ) ) | UNPUBLISHED OPINION |
| DEPARTMENT OF LABOR AND INDUSTRIES OF THE STATE OF WASHINGTON, | ) ) ) ) | |
| Respondent. | ) | FILED: September 24, 2018 |

SCHINDLER, J. — IMCO General Construction Inc. (IMCO) appeals the

decision of the Board of Industrial Insurance Appeals (Board). The Board

affirmed the citation and notice of assessment issued by the Department of Labor

and Industries for two serious violations of the Washington Administrative Code:

(1) Failure to comply with manufacturer procedures applicable to disassembly in

violation of WAC 296-155-53402(1)(a) and (2) failure to ensure workers involved

in the 240-foot crane disassembly were aware of the associated hazards in

violation of WAC 296-155-53401(4)(h). The administrative law judge found the

department did not establish a serious violation because no employee was

exposed to a hazard with a substantial probability of serious bodily injury or death

and vacated the citation. The Board reversed. The Board found IMCO workers

were exposed to the substantial probability of death or serious bodily injury when the boom on the 200-ton crane snapped and collapsed. The superior court affirmed the Board decision. Because substantial evidence supports the Board decision, we affirm.

## FACTS

IMCO General Construction Inc. (IMCO) was the general contractor on the Lynden water treatment plant construction project. IMCO purchased a Kobelco CK2000 crane for the project. The Kobelco CK2000 is a 200-ton crane with a 240-foot vertical boom. IMCO had never used a Kobelco CK2000 crane before. A Kobelco representative helped assemble the crane. The Kobelco representative did not train IMCO workers on how to disassemble the crane.

The boom on the Kobelco CK2000 crane extends vertically from the cab, while the jib attached to the top of the boom extends horizontally. The crane operator can move the jib attached to the 240-foot vertical boom and change the angle of the boom. Separate sections of the 240-foot boom are connected with pins.

In May 2014, IMCO crane operator Donald Ensley decided to shorten the boom of the crane by 40 feet. Ensley discussed the plan to disassemble the crane with IMCO mechanic Tyler Cowman. IMCO assigned Scott Farah and Clay Dickenson to help Ensley and Cowman. Ensley and Cowman planned to lower the 240-foot boom to the ground, then lift the boom slightly to create slack along the bottom of the boom. Ensley planned to cantilever or extend horizontally one end of the boom to create the slack. After Ensley lifted the

boom, Cowman and either Farah or Dickenson were going to hammer out the pins in the boom that held the section they planned to remove.

On May 9, Ensley was in the cab of the crane while Cowman, Farah, and Dickenson stood near the tip of the boom. As Ensley began to lift the boom to allow the workers to remove the pins, the arm of the crane snapped. Debris and cables came off the crane, landing nearby and over the cab of the crane.

Department of Labor and Industries (Department) crane safety compliance officer Richard Borsini investigated. Borsini took photographs and interviewed the workers involved. The Department issued a citation and notice of assessment for two "serious" violations: (1) Failure to comply with manufacturer procedures applicable to disassembly in violation of WAC 296-155-53402(1)(a) and (2) failure to ensure all personnel involved in the disassembly are aware of the associated hazards in violation of WAC 296-155-53401(4)(h). IMCO appealed.

Ensley, safety compliance officer Borsini, and IMCO safety manager Thomas Pike testified at the hearing. Borsini testified that the hazard posed by the failure to follow manufacturer requirements and make the workers aware of what could happen during disassembly and that the "structural failure of steel" could injure the workers "through flying debris" and "crushing hazards" and result in "severe or partial permanent disability and possibly death." Borsini testified that although Ensley was in the cab, he was also exposed to the flying debris and the broken cables.

The administrative law judge (ALJ) concluded the Department did not carry its burden of establishing IMCO workers were exposed to a hazard posing a substantial probability of serious bodily injury or death and vacated the citations.

The Department filed a petition for review with the Board of Industrial Insurance Appeals (Board). The Board reversed the ALJ decision and order. The Board entered a "Decision and Order" affirming the citation and notice of assessment issued by the Department against IMCO for serious violations of WAC 296-155-53402(1)(a) and WAC 296-155-53401(4)(h).

The Board found that "while Kobelco trained IMCO's workers regarding assembly of the crane, they did not train them regarding its disassembly." The Board found, "None of the IMCO workers who were working to shorten the crane had been trained on how to disassemble the crane and the operator had not read Kobelco's operation and maintenance manual." "Because of the danger of structural failure, Kobelco recommended that no section of the crane longer than 50 feet should be cantilevered."

The findings state that contrary to the Kobelco manual, Ensley planned to cantilever 200 feet of the crane to "create sufficient slack so that the pins attaching the 40-foot section of the crane that IMCO's workers intended to remove could be displaced." Although Ensley and Cowman "discussed the process they intended to use before beginning, . . . they did not discuss the process with the other two IMCO workers who assisted in the disassembly

4

process," Farah and Dickenson. While Ensley cantilevered the boom, Cowman,

Dickenson, and Farah "stood at the tip of the crane." The Board found:

> After the crane's boom was lowered to the ground, Donald Ensley
> ... attached the crane's bridle to a point situated near the
> operator's cab and cantilevered the boom in order to draw slack at
> the 40-foot section to be removed. Next, two other IMCO workers
> were supposed to remove pins to detach the section that was to be
> removed. Mr. Ensley had no prior experience in operating a
> Kobelco crane and he had not read the manufacturer's manual.
> The raised portion of the boom unexpectedly collapsed before the
> pins could be removed.

The Board concluded the IMCO workers were exposed to a serious

hazard because they "were in the zone of danger."

> [O]nce the crane was cantilevered, Mr. Cowman and another IMCO
> worker were to immediately hammer out the pins that attached the
> section of the crane that was to be removed from the rest of the
> crane. The pins were located close to the area of the crane that
> failed and collapsed.

The Board concluded the Department accurately "assessed the severity of

the hazards created by" the safety violations.

> 11. The Department accurately assessed the probability that an
> IMCO worker would be killed or seriously injured at two on a
> scale of six because only one IMCO worker, the crane
> operator, was immediately exposed to the hazards created
> by the safety violations committed by IMCO.
>
> 12. The Department accurately assessed the severity of the
> hazards created by IMCO's safety violations at six on a scale
> of six because had harm resulted from the violations, the
> harm would have been death or serious physical harm.

IMCO filed an appeal in superior court. The court affirmed. The court

ruled substantial evidence supported the Board decision.

> Substantial evidence supports the Board's conclusion that IMCO
> workers were in the zone of danger when the crane collapsed. The
> evidence showed that while no workers were injured when the

5

crane collapsed, the crane operator was near the zone of danger, observing debris fly over the cab of the crane. In addition, employees were observing the crane as it was lowered and some were tasked with running underneath it immediately after the crane was lowered. While the Petitioner correctly asserted that the workers did not actually run toward the crane after its collapse, the Board concluded in its Findings of Facts that "none of the IMCO workers . . . had been trained on how to disassemble the crane . . . ." In addition, the Board found that the Department of Labor and Industries correctly assessed that IMCO workers could have been killed or seriously injured as a result of the accident.

## ANALYSIS

IMCO contends substantial evidence does not support the Board finding IMCO committed the serious violations for (1) failure to comply with manufacturer procedures applicable to disassembly and (2) failure to ensure all workers involved in the disassembly were aware of the associated hazards.

The Washington Industrial Safety and Health Act of 1973 (WISHA), chapter 49.17 RCW, governs our review. The purpose of WISHA is to "assure, insofar as may reasonably be possible, safe and healthful working conditions for every man and woman working in the state of Washington." RCW 49.17.010. All regulations implemented under WISHA should be construed in light of the purpose of the statute. Mid Mountain Contractors, Inc. v. Dep't of Labor & Indus., 136 Wn. App. 1, 4, 146 P.3d 1212 (2006) (citing Adkins v. Alum. Co. of Am., 110 Wn.2d 128, 146, 750 P.2d 1257, 756 P.2d 142 (1988)). WISHA gives the Department the authority to promulgate regulations governing workplace safety. RCW 49.17.050. An employer commits a serious WISHA violation when there is

a substantial probability that death or serious physical harm could result from a condition which exists, or from one or more practices, means, methods, operations, or processes which have been adopted or are in use in such workplace, unless the employer did

6

not, and could not with the exercise of reasonable diligence, know of the presence of the violation.

RCW 49.17.180(6).

In a WISHA appeal, the findings of fact of the Board are conclusive if substantial evidence supports the findings when viewed in light of the record as a whole. RCW 49.17.150(1); Express Constr. Co. v. Dep't of Labor & Indus., 151 Wn. App. 589, 595-96, 215 P.3d 951 (2009); Inland Foundry Co. v. Dep't of Labor & Indus., 106 Wn. App. 333, 340, 24 P.3d 424 (2001). We review the decision of the Board "directly, based on the record before the agency." Legacy Roofing, Inc. v. Dep't of Labor & Indus., 129 Wn. App. 356, 363, 119 P.3d 366 (2005). If substantial evidence supports the findings, we determine whether the findings support the conclusions of law. Mid Mountain, 136 Wn. App. at 4; see RCW 49.17.150(1).

Substantial evidence is evidence in sufficient quantity to persuade a fair-minded person of the truth of the declared premise. Mowat Constr. Co. v. Dep't of Labor & Indus., 148 Wn. App. 920, 925, 201 P.3d 407 (2009). We view the evidence and reasonable inferences in the light most favorable to the prevailing party; here, the Department. Erection Co. v. Dep't of Labor & Indus., 160 Wn. App. 194, 202, 248 P.3d 1085 (2011). We do not reweigh the evidence. Davis v. Dep't of Labor & Indus., 94 Wn.2d 119, 124, 615 P.2d 1279 (1980).

The Department has the burden to prove a serious violation. Mowat, 148 Wn. App. at 924. To establish a serious violation of the WISHA safety regulation, the Department must prove:

"(1) [T]he cited standard applies; (2) the requirements of the

7

standard were not met; (3) employees were exposed to, or had access to, the violative condition; (4) the employer knew or, through the exercise of reasonable diligence, could have known of the violative condition; and (5) there is a substantial probability that death or serious physical harm could result from the violative condition."

Wash. Cedar & Supply Co. v. Dep't of Labor & Indus., 119 Wn. App. 906, 914, 83 P.3d 1012 (2004)[1] (quoting D.A. Collins Constr. Co. v. Sec'y of Labor, 117 F.3d 691, 694 (2d Cir. 1997)); RCW 49.17.180(6). IMCO challenges only whether workers were exposed to, or had access to, a hazard.

Under WAC 296-155-53402(1), employers must comply with manufacturer prohibitions when disassembling a crane. Former WAC 296-155-53402(1) (2013)[2] states:

When assembling and disassembling crane/derrick (or attachments), the employer must comply with all applicable manufacturer prohibitions and must comply with either:
(a) Manufacturer procedures applicable to assembly and disassembly; or
(b) Employer procedures for assembly and disassembly. Employer procedures may be used only where the employer can demonstrate that the procedures used meet the requirements in subsection (17) of this section.[3]

---

[1] Internal quotation marks omitted.

[2] WAC 296-155-53402 was amended in 2016 to replace "the employer" with "you." WASH. STATE REGISTER 16-09-085 (May 20, 2016). This was the only amendment to WAC 296-155-53402 in 2016.

[3] Former WAC 296-155-53402(17) states:

When using employer procedures instead of manufacturer procedures for assembling or disassembling, the employer must ensure that the procedures are designed to:
(a) Prevent unintended dangerous movement, and to prevent collapse, of any parts of the crane/derrick.
(b) Provide adequate support and stability of all parts of the crane/derrick during the assembly/disassembly process.
(c) Position employees involved in the assembly/disassembly operation so that their exposure to movement or collapse is minimized.
(d) Qualified person. Employer procedures must be developed by a qualified person.

Substantial evidence supports the Board finding IMCO violated WAC 296-155-53402(1). The record establishes a Kobelco representative helped assemble the crane but the representative did not train Ensley or any other workers on disassembly of the crane. The Kobelco manual was available but neither Ensley nor the other IMCO workers reviewed the manual. The manual expressly restricts cantilevering to no more than 50 feet of the boom. Nonetheless, Ensley attempted to cantilever approximately 200 feet of the boom. The evidence established the attempt to cantilever the boom 200 feet caused the boom of the 200-ton crane to snap and break.

Under WAC 296-155-53401(4)(h), employers must ensure workers are aware of the associated hazards involved in the disassembly of a crane. WAC 296-155-53401(4)(h) states, "The crane user's duties would include . . . [e]nsuring that all personnel involved in maintenance, repair, transport, assembly, disassembly, and inspection are aware of their assigned duties, and the associated hazards."

Under RCW 49.17.180(6), the Department must prove workers were exposed to or had access to the violative condition. Mowat, 148 Wn. App. at 924. To determine whether a worker is exposed to a hazard, the Department must show the worker had "access to the violative conditions." Adkins, 110 Wn.2d at 147. "To establish employee access, the Department must show by 'reasonable predictability that, in the course of [the workers'] duties, employees will be, are, or have been in the zone of danger.' " Mid Mountain, 136 Wn. App.

9

at 5[4] (quoting Adkins, 110 Wn.2d at 147).

Substantial evidence supports the Board finding that IMCO did not ensure the workers involved in the disassembly of the Kobelco CK2000 crane were aware of the associated hazards. Ensley testified he discussed "potential issues with the boom length" with Cowman. But Ensley did not "recall" discussing the hazards of disassembly with Farah and Dickenson.

IMCO argues the workers were never exposed to the hazard because Cowman, Farah, and Dickenson were not near the boom when it snapped, and although Ensley was nearby, he was protected by safety glass in the cab.

Contrary to IMCO's argument, substantial evidence supports the Board finding that Cowman, Farah, and Dickenson had access to the hazard. The evidence showed that moments before the crane snapped, the workers were located near the boom. Ensley testified that after he cantilevered the boom, he planned to stop raising the crane so "the workers could then approach and then take out the pins" using hammers. Ensley testified Cowman, Farah, and Dickenson were "on the far end of the boom" near the crane tip. Ensley said that after the crane collapsed, wire support cables "were kind of moving around, flying around on top of the boom." Safety compliance officer Borsini testified that if the boom had collapsed when the workers were hammering the pins, "there could have possibly been crushing hazards." The evidence establishes a reasonable predictability that in the course of their duties on May 9, the IMCO workers would have been exposed to the hazard. Mid Mountain, 136 Wn. App. at 5.

---

[4] (Emphasis in original) (alteration in original).

Viewing the evidence in the light most favorable to the Department, substantial evidence supports the Board finding that Ensley was also exposed to the "hazard of flying debris" and the broken cables and a substantial probability of serious physical harm.

We affirm the Decision and Order of the Board that IMCO committed a serious violation of WAC 296-155-53402(1)(a) and WAC 296-155-53401(4)(h).

WE CONCUR: